1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| JADE WILCOX, on behalf of herself, and all others similarly situated, | ) ) ) | Case No. 2:17-cv-00275-RMP |
| | ) | December 13, 2018 |
| Plaintiff, | ) ) | Spokane, Washington |
| vs. | ) ) | Motion Hearing |
| SWAPP LAW, PLLC, dba CRAIG SWAPP AND ASSOCIATES; and JAMES CRAIG SWAPP, individually, | ) ) ) | Pages 1 - 57 |
| Defendants. | ) | |

BEFORE THE HONORABLE ROSANNA MALOUF PETERSON
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:              MARCUS SWEETSER
                               THOMAS G. JARRARD
                               Attorneys at Law
                               1020 N. Washington St.
                               Spokane, Washington 99201

                               ROBERT JOSEPH BARTON
                               Attorney at Law
                               1735 20th Street, N.W.
                               Washington, D.C. 20009

For the Defendants:            BARBARA J. DUFFY
                               RYAN P. MCBRIDE
                               Attorneys at Law
                               1420 Fifth Ave., Ste. 4200
                               P.O. Box 91302
                               Seattle, Washington 98111

Official Court Reporter:       Allison R. Stovall, CRR, RPR, CCR
                               United States District Courthouse
                               P.O. Box 700
                               Spokane, Washington 99210
                               (509) 458-3465

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

1          (Court convened on December 13, 2018, at 9:30 a.m.)

2          THE COURTROOM DEPUTY:  I have *Jade Wilcox, on behalf*

3   *of herself, and all others similarly situated, versus the Swapp*

4   *Law, PLLC, et al.*, Case No. 2:17-cv-275-RMP; time set for motion

5   hearing.

6          Counsel, would you please make your appearances for the

7   record?

8          MR. BARTON:  Good morning, Your Honor.  Joseph Barton

9   on behalf of plaintiff, Jade Wilcox.  I may be listed as Robert

10  -- Robert Barton, but I go by my middle name.  It's Robert

11  Joseph Barton.

12         THE COURT:  Well, I guarantee I'll only call you

13  Mr. Barton; so okay.

14         MR. BARTON:  That's fine.  With me is Thomas Jarrard

15  and Marcus Sweetser.

16         THE COURT:  Okay.

17         MS. DUFFY:  Your Honor, for the defense, Barbara Duffy

18  and Ryan McBride from the Lane Powell firm.

19         THE COURT:  All right.  Good morning.  I have read all

20  of the briefing and reviewed the documents.  I'm just pulling up

21  my notes here.

22       So Mr. Barton, your motion to certify class?

23         MR. BARTON:  Yes, Your Honor.  Good morning, Your

24  Honor.

25         THE COURT:  Good morning.

1          MR. BARTON:  As I believe this Court is well-aware,

2    this case involves the fault purchase of police traffic

3    collision reports, also known as PTCRs or just collision

4    reports, by defendants for the purpose of conducting marketing.

5    Plaintiffs contend that those collision reports were created

6    using information that was derived from motor vehicle records;

7    and as a result, the defendants obtaining and using those

8    reports and the information that was contained in it therein for

9    marketing purposes violated the DPPA, the Driver's Personal

10   Protection Act.

11         We are here this morning because the plaintiff has

12   requested the Court certify a class, and the class consists of

13   all drivers who are listed on those collision reports where the

14   information came from certain motor vehicle records, namely

15   driver's license, registrations, or data, whether the data, the

16   bar code data or the database, and they -- those reports were

17   obtained by Swapp, Mr. Swapp or the Swapp Law Firm.

18         We have excluded people who were either clients of the

19   Swapp Law Firm, employees of the Swapp Law Firm, or even drivers

20   who are on a collision report where they had a client on the

21   report, and we've also excluded from the class people who

22   provided written consent.

23         The -- in this case, there is no question the defendants

24   repeatedly and systematically purchased police traffic collision

25   reports from the Washington State Patrol.  They admittedly

1  purchased during the time period, which is the class period,

2  which is September 1st, 2013, through June 23rd, 2017, 9,000

3  such reports.  The purpose, I don't think there's any dispute,

4  was to extract information, the personal information of drivers

5  that were involved in motor vehicle accidents, and to send

6  business solicitation letters to those drivers from the Swapp

7  Law Firm to solicit business.

8      The law enforcement officers across Washington state,

9  whether or not they were in Washington State Patrol or at other

10 law enforcement agencies, use standard procedures and standard

11 forms to prepare the police traffic collision reports.  They

12 were using the same form, whether it was prepared electronically

13 or on paper form.  95 percent of those law enforcement agencies

14 across the state of Washington use an electronic program called

15 SECTOR to prepare that, to prepare the forms and prepare the

16 collision reports.

17     Law enforcement officers across the state of Washington

18 were also uniformly trained to and did uniformly or routinely

19 complete those collision reports, and what the preference in

20 terms of how to complete them was to swipe in this order: the

21 bar code data off the registration, the bar code data off of the

22 driver's license; if that was not available, to manually input

23 the information on the front of the license or the front of --

24 actually, the preference is the manual -- the manual information

25 off the registration and then the manual -- the information off

1   the front of the driver's license.

2        If that was not available for some reason, somebody didn't

3   have those documents, they could ask the information from the

4   driver.  They were instructed to perform a driver's check.  That

5   was the preferred procedure, or they could perform a driver's

6   check.  And what a driver's check is, is either accessing

7   database information either directly from a computer, if they

8   had a computer in the car, which many of them do -- I think the

9   overwhelming majority have computers in the car -- or they can

10  call essentially back to headquarters, and headquarters at their

11  police department can run that check.

12        There is -- they keep a record of whether or not there is a

13  check that is done.  There is a dispute of whether or not there

14  is a record, of whether or not the SECTOR system keeps a record

15  of whether or not it was manually created or electronically

16  created.  But what is not disputed is that the DOL does keep

17  address information going back seven years as to when people

18  make changes and what the -- so if somebody made an address

19  change in their -- to the DOL, whether or not that can match up

20  to the accident report, that -- there is information that we can

21  check as to whether or not the DOL data matches up with the

22  license -- I'm sorry, the address information on those collision

23  reports.

24        The bar code data, I think we explained, as I explained on

25  the motion to dismiss, contains information that -- from --

1   populated from the DOL database.  The DOL considers that

2   information to be confidential personal information.  The

3   driver's license and registration and all the data on both

4   documents are considered by the Department of Licensing to be

5   their property and considered to be protected personal

6   information that cannot be used except for government purposes

7   or certain specified purposes.  The Department of Licensing

8   trains law enforcement officers that such personal information

9   derived from driver's license and registrations cannot be used

10  for other purposes.

11        Rule 23 creates a categorical rule that if you meet the

12  requirements under Rule 23, a class must be certified.  The

13  Supreme Court in *Shady Grove* explained that if the Court finds

14  the standards are met, the requirements are met, the Court does

15  not have discretion to deny certification for some other reason.

16  The Supreme Court and the Ninth Circuit have repeatedly

17  explained that you can consider the merits questions but only to

18  the extent necessary to resolve whether or not Rule 23 and its

19  standards have been met.  What is not a relevant consideration

20  on Rule 23 is whether or not plaintiff will prevail on the

21  merits.  You can certify a class even if you were sitting here

22  thinking plaintiff is not going to prevail on the merits.  It is

23  fine to certify a class where you believe the plaintiff should

24  lose or will lose.

25        In this case, defendants make a request that the Court

1    essentially determine and make a determination of the merits

2    with respect to whether or not certain information qualifies as

3    a motor vehicle record.  Plaintiffs believe, based on the Ninth

4    Circuit and the Supreme Court juris prudence, that is an

5    improper request, and the Court should not do that.

6           With respect to the elements of Rule 23, the defendants do

7    not contest the element of Rule 23(a)(1); that is a joinder is

8    impractical because there's a sufficient number of class

9    members.  And defendants do not contest that Rule 23(a)(4), the

10   adequacy of the plaintiff or the adequacy of counsel exists.

11          In making their arguments opposing class certification,

12   defendants largely rely on out-of-circuit cases.  They -- not

13   generally address the cases that plaintiffs cite, and really

14   what defendants' argument boils down to are three basic

15   arguments.  First, defendants argue that the facts underlying

16   the claims of the class are too variable; and despite the fact

17   that there is evidence of uniform forms, uniform training, and

18   uniform procedures across the state, what the defendants want to

19   have this Court believe is that police officers, who at least I

20   consider to be one of those professions where uniformity and

21   procedures are a part and parcel of their profession, they want

22   to have the Court believe that police officers ignore directives

23   and populate personal information in those collision reports in

24   a highly variable manner, contrary to the systemized and well-

25   documented procedures that are supposed to be used.

1      What they also -- they also argue that class-wide

2   resolution of these issues is not superior.  What they're

3   essentially arguing is it would be better for 9,000 separate

4   suits alleging identical conduct by the defendants and identical

5   statutory damages to be brought.  And the third argument

6   concerns the typicality of Ms. Wilcox, and they argue that her

7   memory lapse, which she -- between the time she sent in

8   interrogatory and the time of her deposition where she came out

9   and explained the reasons for and what triggered her memory

10   disqualifies her because it makes her not credible.

11      And I think what underlies most of these arguments,

12   particularly their first argument, is an argument that the Ninth

13   Circuit has rejected, and it is based on the fallacious premise

14   that if actual class members cannot be later determined except

15   on a report-by-report basis, class certification is not

16   appropriate.  And what the -- the Ninth Circuit specifically

17   addressed this in the context of a class definition, and so

18   defendants have transformed this argument away from the

19   definition of the class itself and used it to undermine and

20   buttress other arguments, but it's equally wrong when they

21   address it as the typicality or predominance.

22      With respect to the definition of the class itself, the

23   Ninth Circuit's only requirement is that it be defined by

24   objective criteria; that is the *ConAgra* case.  The Ninth Circuit

25   has affirmatively and definitively rejected that a -- a need to

1   show administrative -- administrative feasible way to identify

2   class members other than by self-identification.  And if you

3   look at the *ConAgra* case, I think that is illustrative of what

4   the Ninth Circuit's position is.  That is a case in which it was

5   a consumer case alleging deceptive practices in the sale of

6   vegetable oil through, of course, grocery stores where consumers

7   buy them, and the Ninth Circuit readily admitted there was no

8   way to identify class members because class members don't save

9   grocery receipts for -- for when they buy cooking oil or

10  vegetable oil, but that did not prevent class certification.

11      What we have here is we have objective criteria, and

12  defendants do not suggest that our definition in -- in the class

13  definition itself is not based on objective criteria, and

14  there's three portions of it.  You can break it down as three

15  parts.  Is the driver on a collision report the defendants

16  obtained between September 1st, 2013, and June 23rd, 2017?  We

17  can look at the reports.  We have records as to when they

18  obtained what reports.

19      The second is whether or not the information originated

20  from a DOL record; and the plaintiff's position is whether it

21  comes from a driver's license, bar code data, registration,

22  whether it's on the front or the data or whether it comes

23  through the database, all of that is protected information.

24      And the third is is the person not a client of Swapp, a

25  Swapp employee, and did they not provide written consent?

1      Defendants really only contest the second portion of it,

2   but their -- their premise is that you need to have absolute

3   certainty at the time of class certification to identify all the

4   class members, and that is not a requirement.  That's exactly

5   contrary to what *ConAgra* says, and the specific line in ConAgra

6   is a warning that the perfect should not be the enemy of the

7   good.  What the Ninth Circuit is saying is perfect accuracy,

8   even later in the process, is not required to identify all the

9   class members.  What we do know here is we know what the systems

10  were to create these reports, and we know that their -- there

11  were standard procedures to develop these reports.

12      Even if we needed to establish the identity of class

13  members, there are multiple ways to do that here.  We can do

14  that through the standard procedures of how they were created,

15  looking at the data from the bar code; and the -- if there's no

16  bar code, from the driver's license; and if there is a

17  difference or new information, officers are trained to check

18  that there is a new -- new address information.

19      But perhaps the best way is that we can compare, as I

20  mentioned earlier, the Department of Labor -- sorry, Department

21  of Licensing records as to when people submitted address change

22  and what the address change was and what the address was that

23  the Department of Licensing had and compare that to the address

24  on the report itself.  If it doesn't match the registration or

25  -- the address on the registration or their address of the

1   driver's license, then compare that to the -- what's on the

2   accident report.

3        As I mentioned earlier, there's testimony that there is in

4   fact a code in the SECTOR database which would indicate whether

5   or not the report was created using the bar code data.  I

6   understand the defendants have now submitted an affidavit from

7   somebody after a deposition saying that doesn't exist, but if we

8   can go out and find that exists, that is also a helpful way.

9        The fourth way which the Ninth Circuit allows is for the

10  class members to submit their own information.  They can submit

11  affidavits explaining what they did at the scene.  Did they just

12  provide their driver's license?  Did they just provide their

13  registration?  Did they only confirm that that was -- that's the

14  only information?  The defendants -- what the Ninth Circuit then

15  says is after liability is established, the defendants are free

16  to then go challenge these class members on an individual basis,

17  but that is a process the Ninth Circuit allows to allow the

18  identification and certification of the class.

19        I'll skip over -- because the defendants don't contest the

20  joinders and practical, I'll skip over to commonality and what

21  commonality requires.  Rule 23(a)(2) is only a single question

22  of law or fact.  It does not require that all or even a majority

23  of the issues be common so long as there is a central issue that

24  can be decided in one stroke, and that central issue does not

25  need to resolve the entire case.

1      Plaintiffs have identified three common questions on

2   liability:  Number one, the question of whether or not

3   information in the collision reports are derived from motor

4   vehicle records.  Question two, did defendants knowingly obtain

5   that information?  And question three, did they obtain it for a

6   permissible purpose?  Defendants really only contest issue

7   number one, and the existence of those other two will be

8   sufficient to certify a class.

9      Defendants don't contest that there are standard

10  procedures, and there are standard procedures in how law

11  enforcement created the reports.  There are standard procedures

12  in terms of Washington State Patrol collecting and selling the

13  reports, and there is a systematic procedure that the Swapp Law

14  Firm had in buying and using them for marketing.  That creates a

15  standard course of conduct, and that, in and of itself, creates

16  commonality.

17     The defendants' real dispute is not whether or not there

18  was a common course of conduct here.  Their really dispute is

19  about whether or not bar code data and information on the front

20  of the driver's license and registration constitute protected

21  personal information under the DPPA.  That's their real dispute.

22  That is a -- that creates a common legal issue, and that common

23  legal issue supports class certification.  Remember, it's a

24  common question of law or fact.  Common course of conduct with a

25  question of -- that the defendants want to raise of whether or

1   not this is protected information of the DPPA creates a common

2   issue of fact.

3          Moving on to Rule 23(a)(3), that creates -- that sets the

4   standard of whether or not there are claims or defenses that are

5   typical.  Are the plaintiff's claims or defenses typical?  With

6   respect to plaintiff's claims, typical claims only need to be

7   reasonably co-extensive.  When you have a policy or practice

8   that affects the class members, typicality exists.  Again, it's

9   the common standard course of -- standard course of conduct.

10  We've got creation of collision reports with standard forms and

11  procedures, the standard practice of selling them and standard

12  practice by which Mr. Swapp bought them and used them for

13  marketing purposes and the Swapp Law Firm.

14         Despite those practices, the defendants say there's no

15  typical plaintiff.  That's their argument.  Their argument is

16  there's no one in this class that could be a typical plaintiff.

17  Here is the problem with their arguments.  They, first of all,

18  factually ignore -- or they want the Court to assume that law

19  enforcement is ignoring their training, ignoring the actual

20  manuals.

21         They also ignore that typicality has a permissive standard,

22  and here are -- the Ninth Circuit in the *Torres* case set forth

23  the measures of typicality and the questions that the *Torres*

24  case asked.  One, did other class members have a same or similar

25  injury?  That's question one.  Question two, is it based on

1   conduct not unique to the plaintiff?  And question three, are

2   other class members injured by the same conduct?  All three of

3   those are met here.

4        The question is -- we know that all -- the other class

5   members, 9,000 people, had their reports obtained by -- by the

6   Swapp Law Firm.  The plaintiff complains of that conduct and the

7   sending of marketing materials, and it all rises out of these

8   same practices.

9        The Ninth Circuit also said in *Torres* even a wide variation

10  of a fact pattern is okay.  It's still permissible to find

11  typicality.  So what do the -- what do the defendants do?  They

12  ignore the Ninth Circuit standards.  What they want to have the

13  Court look at is a case called *Pavone versus Meyerkord* out of

14  the Northern District of Illinois.  If you look at the facts

15  there and what the evidence that was developed or not developed

16  in that case, it's a startling difference.

17       The class certification there was based on an unsupported

18  assertion that all reports -- or reports would contain personal

19  information.  The class was not limited to drivers.  It was not

20  limited to reports with any -- derived from motor vehicle

21  records, and there was no evidence of any systematic methods of

22  creation of those reports.

23       The defense also point to a defense that they say -- claim

24  impedes typicality.  Under the Ninth Circuit standard, a defense

25  only impedes typicality if it's unique to the plaintiff and it

1  threatens to become the focus of litigation.  It is a rare

2  circumstance that credibility undermines a class rep., and it

3  really needs to go to the heart of the claims.  Petty

4  credibility challenge don't suffice to do that, and it's an

5  interesting way that the defendants challenge this.  They

6  challenge it under typicality when it's normally challenged

7  under adequacy, but defendants don't challenge plaintiff as an

8  adequate class representative here.

9      What they really focus on is a memory lapse that plaintiff

10 had where she was very forthcoming in her deposition of what

11 happened and explained how her memory was -- how her memory came

12 back to her, and this happens.  And what happened in this

13 case -- what they're complaining about is in an interrogatory,

14 she had responded that at the scene of the accident, she had

15 provided the officer with her driver's license, with her

16 registration, and that she had confirmed that the address

17 information on both were accurate.

18     She had forgotten that her -- the address on her driver's

19 license was in fact different than the one on her registration,

20 but when she saw her prior license and her prior registration,

21 which she didn't have and she had to go back and get because she

22 no longer had the car -- and I'm amazed that she kept her prior

23 driver's license.  When she saw those, she realized that -- she

24 remembered that what she in fact told the officer was that her

25 registration address was current and up-to-date and the driver's

1   license was different.

2        That is not a credibility issue.  That's the way people's

3   memories work.  When you see documents, when you see

4   information, your memory is triggered.  It is the way -- ask any

5   psychologist.  It is the way people's memories work.  We don't

6   necessarily think lineally -- lineally, in a lineal -- lineal

7   fashion.  That's the way people's memory loss -- this is not a

8   credibility issue and is certainly not -- when she remembered

9   what exactly happened does not affect the claims in this case

10  and should not be some issue that is going to prevent her to be

11  a class rep. or should come up at trial.

12       Briefly with respect to the adequacy of plaintiff and

13  plaintiff's counsel, as I said, defendants do not suggest that

14  there is some conflict among the class, and there's really two

15  questions on adequacy:  One, are there any conflicts that

16  plaintiff or plaintiff's counsel have; and two, will plaintiff

17  and her counsel vigorously prosecute the claims?

18       Defendants don't suggest that there's any conflict.  They

19  do not suggest that plaintiff or her counsel will not vigorously

20  prosecute the claims.  Defendants have explicitly said that they

21  believe my firm, the Block and Leviton firm, are adequate in our

22  papers.  I've submitted my experience, my firm's experience

23  handling numerous large-scale complex litigation and class

24  litigation, including trials that I've successfully tried,

25  class-action cases.

1    They neglect to -- we have also asked that Mr. Jarrard be

2    appointed as co-lead class counsel here.  Defendant has not

3    addressed Mr. Jarrard's qualifications.  They are also in our

4    papers.  I have personally worked with Mr. Jarrard on several

5    class actions that were successfully resolved, including one

6    recently against the Washington State Patrol that was resolved

7    over in state court and others.  Based on his background and

8    experience, he should also be appointed co-lead counsel.

9        With respect to Rule 23(b), plaintiff has requested this

10   case be certified under Rule 23(b)(3), which has two components.

11   The first is whether or not common issues predominant --

12   predominate, and what the Ninth Circuit has said has sort of

13   independent ways to determine whether or not there is

14   predominance of common issues over individual ones, is if the

15   common issues are either more prevalent or more important than

16   the individual ones, you have predominance.

17       The second thing to look at -- and these, I think, are

18   independent and separate ways the Ninth Circuit has identified

19   how to -- or instructed how to identify predominance.  The

20   second way is if those questions prevent -- present a

21   significant aspect of the case to be resolved for all class

22   members, you have predominance.

23       The third way to look at predominance:  If you have a

24   common nucleus of facts and potential legal remedy, you have

25   predominance.  And the fourth way to look at predominance:  Is

1   there a common course of conduct that affected all class

2   members?  If there is, you have predominance.  And I think if

3   you look at those, we have those met readily in this case.

4        What predominance does not require, it does not require all

5   aspects of the case be subject or susceptible to common proof.

6   The Supreme Court recognized that in the *Amgen* case.  They

7   recognized that in the *Tyson Food* case where they explicitly

8   said there can be important issues that are tried separately.

9        Even if that's so, you still have -- you can still have

10  predominance.  And that, I think, is where the defendants erred.

11  They assume that all issues in the case have to be common in

12  order to meet predominance.  That's not predominance.

13       The important issues are the three issues that I mentioned

14  earlier.  They were mentioned/discussed on commonality.  Those

15  are the three important issues.  Defendants do not dispute that

16  those are the most important issues in this case, and those

17  issues predominate throughout this case.

18       The determination of the legal issue that defendants want

19  and the plaintiff wants to get determined in this case, that

20  determination alone meets the predominance requirement.  The

21  fact that we have a standard set of procedures and practices

22  with respect to that issue, namely whether or not the driver's

23  license, registration, and bar code data are derived from motor

24  vehicle records and qualify under the DPPA, that creates

25  predominance in this case.

1      The defendants' primary argument is that if the class

2   includes some drivers where the information did not come from

3   motor vehicle records, that creates a problem.  That is contrary

4   to what the Supreme Court decided in the *Tyson Food* case.  It's

5   contrary to what the Ninth Circuit said in the *ConAgra* case.

6      And again, the defendants' theory on this is counterfactual

7   and based largely on speculation.  They want the Court to

8   believe that there are -- police officers did not follow general

9   standard procedures, and they want to assume that there may have

10  been some errors where people didn't follow them 100 percent of

11  the time, but that does not undermine predominance.  The Supreme

12  Court recognized in the *Halliburton* case the defendant's ability

13  to pick off certain class members and determine that they were

14  not -- should not recover does not undermine predominance.

15     And I think the best illustration of that is the Sixth

16  Circuit case in *Young*, and it recognized that there can be

17  irregularities.  There always are irregularities if you have

18  standard procedures, but the fact that there are -- that humans

19  make mistakes and they don't always follow standard procedures

20  does not undermine predominance when you have a systematic set

21  of procedures, when you have systematic set of practices.

22     And that is expressly understood and explained by the Ninth

23  Circuit in the *ConAgra* case where they explain the defendant can

24  raise individual challenges after the determination of liability

25  on a class-wide basis, and this, if you think about it, is why

1  what the Ninth Circuit explains is a course of conduct.  If you

2  prove a course of conduct, a set of practices, of common

3  practices, that is enough to establish predominance.

4      In response to that, what the defendants rely on is, again,

5  they turn to the *Pavone* case, the district court case out of the

6  Northern District of Illinois, and I think there are four -- at

7  least four important differences with respect to predominance to

8  look at.  In *Pavone*, there's no common technology.  Here, we

9  have the SECTOR system and a set of standard forms.  In the

10 *Pavone* case, the law enforcement agencies across Illinois used

11 different forms with different fields.  We have a standard form.

12     In the *Pavone* case, there was no evidence of any uniform

13 training, no evidence of uniform manuals.  There are no standard

14 practices.  That is contrary to what we have here.  And there

15 was apparently very little evidence or discovery that was

16 developed in that case, contrary to what we did here.

17     With respect to the second and third issues, defendants

18 don't contest whether or not the -- the common issues

19 predominate in those.  What they do raise is an issue about

20 damages, and they contend that individual damage assessments

21 will defeat predominance here, but plaintiff is seeking

22 statutory damages for the class.  That calculation is

23 straightforward.  It's 2,500 per.  That is what the statute

24 says.

25     Now, what defendants argue is that you need proof of actual

1  damages, and the plaintiff is going to have to come in and prove

2  that each individual class member was -- had actual damages in

3  order to recover statutory damages.  That is contrary to the two

4  circuits that have decided this issue.  Both circuits, the Ninth

5  Circuit -- I'm sorry.  The Eleventh Circuit and the Third

6  Circuit have said that's not the case.  And interestingly, the

7  defendants cite the *Truesdell* case; and if you read the Eleventh

8  Circuit opinion, the Eleventh Circuit again for the third time

9  rejects that argument and says proof of actual damages is not

10  necessary.  Their -- defendants' own case rejects that.

11      But even if we had to do that, the Ninth Circuit has

12  repeatedly said individual damage calculations do not defeat

13  predominance.  You can have predominance on liability questions

14  and individual damage calculations, and that does not defeat

15  predominance.

16      Turning to the second element of Rule 23(b)(3), the

17  question is whether or not the class action here is superior to

18  other methods to fairly and efficiently adjudicate these claims.

19  That's the test from *Wolin* in the Ninth Circuit.  There are

20  really -- there are four factors that are set out in the rule.

21  One, do plaintiffs have an interest in controlling this case?

22  Courts have generally recognized $2,500 is too small to

23  litigate, and class members therefore do not have an interest in

24  controlling the claims.

25      The second, third, and fourth factors are uncontested by

1    the defendants, whether or not there's any other litigation

2    raising these claims; there are none.  Is this forum the

3    appropriate forum?  It is for multiple reasons.  Swapp,

4    Mr. Swapp and the Swapp Law -- the Swapp Law Firm has an office

5    here.  The class members, their accidents occurred in this

6    district.  The Swapp Firm was looking for drivers who had

7    accidents in the Eastern District of Washington.  And the fourth

8    factor is whether or not there's any manageability issues, and

9    the defendants have not suggested there is.

10        What defendants do instead suggest are -- they make two

11   arguments that perhaps indirectly address plaintiff's or the

12   class members' interest in controlling the case.  They argue

13   that many class members are ignorant of the fact that their

14   rights have been violated, either because Swapp -- the Swapp Law

15   Firm only obtained the reports but didn't actually use them or

16   they have no understanding that -- of where -- that their

17   personal information was used, but the fact that class members

18   are ignorant about their rights actually supports superiority.

19   Courts generally consider the fact that class members don't have

20   incentive or don't even have knowledge to pursue their rights as

21   a reason to certify a class, not to not certify one.

22        The defendants, in response to that, cite the *Truesdell*

23   case, the case from the Middle District of Florida, with an

24   unusual fact pattern.  The fact pattern there was a government

25   employee who had access, by reason of his job, to certain

1  confidential information and protected information, used it to

2  search for women that for some reason he wanted to find where

3  they lived and other personal information.  The plaintiff then

4  sued the government agency for failing, basically, to monitor

5  and control his activities.

6      And it really -- I think it's a poorly-reasoned decision,

7  but the -- it really comes down to an unusual fact pattern, and

8  what -- the most important part of that decision is the court

9  distinguished the facts in that case from the situation

10 involving a mass marketer who used records to communicate with

11 persons to sell them something.  Under the *Truesdell* court's own

12 logic, superiority would be met here.

13     The second argument that defendants made is that they claim

14 that because there are attorney's fees that are available to --

15 to class members here, they each could bring their own claims.

16 Generally in this circuit, courts have concluded superiority is

17 not lacking merely because of the availability of potential

18 attorney's fees.  And two circuits addressing this issue have

19 suggested there may be discretion in terms of the amount or the

20 award of attorney's fees.  I'm certain that if 9,000 people were

21 to bring claims, the defendants would certainly be arguing that

22 they should not get full attorney's fees for bringing these

23 duplicative claims.

24     Defendants also don't explain how having multiple attorneys

25 or multiple attorney's fees and duplicative litigation is

1    somehow more efficient.  It's contrary to that whole idea in

2    terms of what is the most efficient way to resolve this claim.

3        Finally, the defendants ask this Court to decline to

4    certify based on the size of the possible damages in this case,

5    but the Ninth Circuit has rejected that.  What the Ninth Circuit

6    said in the *Bateman* case is even if a class who had rendered

7    defendant's liability enormous, it's not an appropriate reason

8    to deny class certification.  In fact, the Ninth Circuit in

9    *Bateman* reversed a class denial that was done on that basis, and

10   that -- this argument also contradicts the Supreme Court's

11   holding in *Shady Grove*.  The Supreme Court, as I mentioned in

12   the beginning, held that if the standards are met, the class

13   must be certified.

14       There is no evidence here about the size of a potential

15   amount of damages versus the assets of the Swapp Law Firm.  They

16   have not put any in, and we have not conducted any discovery

17   about that yet.  There's also no evidence that with respect to

18   the DPPA that Congress wanted to either curtail class litigation

19   or curtail the amount of damages that could be awarded in class

20   litigation.

21       But we know from other statutes, such as the Truth and

22   Lending Act, that Congress knows how to do it.  And in the Truth

23   and Lending Act, you can get statutory damages; you can get

24   actual damages.  But if you bring a class action under certain

25   provisions of the Truth and Lending Act, Congress has capped the

1   damages at $500,000.  So there is no evidence of that here.

2        There is no evidence to support a reason to deny class

3   certification here based on that argument.  And Your Honor,

4   unless you have questions, I would --

5             THE COURT:  I do not.  Thank you.

6             MR. BARTON:  Thank you.

7             THE COURT:  Ms. Duffy?

8             MS. DUFFY:  Thank you, Your Honor.  I'd like to -- as

9   the Court knows, we briefed all aspects of Rule 23 in our

10  opposition brief, which admittedly was quite dense.  But what I

11  would like to spend my time on in oral argument this morning is

12  an area where plaintiff -- where plaintiff stopped, which is the

13  notion of the (b)(3) criteria, and in particular, the

14  predominance criteria of (b)(3).

15       Although related to commonality, predominance is far more

16  demanding, says our Supreme Court.  Courts should consider,

17  among other things, the likely difficulties in managing a class

18  action.  The court has said in the *Zinser* case in the Ninth

19  Circuit that if the main issues in a case require the separate

20  adjudication of each class member's individual claim or defense,

21  a Rule 23(b) action would be inappropriate, and if -- and common

22  questions predominate only if -- only if the critical issues are

23  subject to generalized or common proof as opposed to an

24  individualized inquiry.

25       Now, Your Honor, a number of critical issues, we contend,

1  involve individual issues, and those individuals issues

2  predominate over common ones.  In particular, the issue we'd

3  like to talk about most is that the foundation of both

4  plaintiff's class definition and her ability to establish

5  liability under the DPPA, specifically whether the source of the

6  information in the PTCR, the report, is a Department of

7  Licensing record under the DPPA.  In other words, is it a motor

8  vehicle record under the DPPA?  If for any particular driver

9  listed on the -- on the PTCR, whether the source of the

10  information was protected by the DPPA, because if not, that

11  driver falls out of the class and there's no DPPA liability.

12       Now, Your Honor, at this stage of the proceedings, the

13  issue is not whether the plaintiff can actually meet her -- meet

14  her burden of proof at trial.  We understand that.  But the

15  issue is whether this critical issue of liability can be proven

16  by the plaintiff with common proof as to all class members.

17       Now, plaintiff's quest to prove her claims on a class-wide

18  basis cannot survive the rigors of the analysis articulated in

19  the court in the *Dukes versus Wal-Mart* case.  This is so because

20  the reports, the PTCRs, are created using information from

21  different sources, many of which are not DPPA-protected, and

22  this is true even if -- even if the driver's license and the

23  registration are considered to be motor vehicle records.  That's

24  an issue that's pending before the Court at this moment.

25       Now, surely if the Court were to conclude that the driver's

1  license and the registration, even the bar codes on them, were

2  not motor vehicle records, we don't think even the plaintiff

3  would argue that this case would be suitable for class

4  certification.  But the plaintiff argues that it can establish

5  that the origin of the PTCRs can be proven by common proof

6  because plaintiff has offered a common proof of the training

7  provided to law enforcement's officers in preparing these

8  reports.

9       First, they offer -- they offer evidence, they say, that

10  all -- that officers are trained to first ask for a driver's

11  license, a registration, proof of insurance, and to confirm with

12  the driver that the information on the documents is correct.

13  And second, they contend that their common proof is that most

14  officers -- 90 percent, they say -- are trained to use SECTOR to

15  then complete the PTCR the report.

16       Now, it's undisputed that SECTOR is an application.  It's

17  simply a template that's on the computer.  It does not have a

18  direct link to the Department of Licensing.  In fact, you can

19  use SECTOR even if you don't have an internet connection.  But

20  plaintiff emphasizes that SECTOR is how the PTCRs are created.

21       Plaintiff tells the Court that the common proof will

22  establish that the source of the information on the PTCRs is the

23  motor vehicle record, which is its burden.  But what is the

24  common proof?  I'll remind the Court that there's -- there's no

25  data that exists that -- as to whether the information on

1    SECTOR, which creates the PTCR, came from a scan or from a

2    manual input.  Admittedly, there is a -- there is a modest

3    dispute about -- about whether there is some code that could be

4    recreated that could tell you whether the driver's license and

5    registration were actually scanned.

6        We submit that the testimony offered by plaintiff was by

7    Carla Weaver, who was a DOL 30(b)(6) designee.  She admitted in

8    the testimony that we provided to the Court that she just

9    thought she remembered this fact from a training she attended.

10   She deferred to the State Patrol, who manages the SECTOR

11   program.  She deferred to the State Patrol.  And in particular,

12   she deferred to a -- someone at the State Patrol called Tania.

13   We then offered the declaration of Tania Johnson, who said there

14   is no way to determine if the PTCR prepared on SECTOR was

15   created through a scan.

16       But even if it was scanned, even if the license and the

17   registration were scanned onto SECTOR, the prepopulated fields

18   can be manually changed with information gathered from another

19   source, and it's undisputed -- undisputed that there's no way to

20   determine if there was a deletion in any of those fields, and

21   it's undisputed that there's no data that exists whether

22   information from an access or driver's return was used to

23   populate the PTCR.

24       Now, admittedly, they can recreate data about whether a

25   driver's return was called, either called to dispatch or

1   accessed on the computer, but once -- if the information is

2   received, usually it's simply to validate the information they

3   otherwise did receive.  There's no data that will tell us

4   whether the access or the driver's return was used to populate

5   the report.  No common proof -- no common proof will show the

6   source of the information on the report.

7       Our position is not that plaintiff must prove her case with

8   certainty at this stage, but at this stage, the plaintiff must

9   show the Court how she intends to prove liability with common

10  proof, and she cannot do that because the common proof she

11  claims that she can establish does not prove liability.  We

12  don't dispute that by and large, officers receive the training

13  to ask for the driver's license, the registration, and the proof

14  of insurance; and if they use SECTOR and the driver's license

15  and registrations are available, the driver has them and they're

16  not damaged and they are scannable, they are trained to scan

17  these documents into SECTOR.  But the problem that plaintiff has

18  is that this training does not prove liability.

19      First, the class definition includes handwritten reports,

20  handwritten PTCRs.  In that case, there's no evidence that

21  SECTOR was even used.  Second, there's no way to know if the

22  training that the officers received was actually employed in any

23  particular case for any particular report.  The testimony before

24  the Court shows that documents are not always scannable.

25      Third, even if the officer did use SECTOR and did follow

1   his or her training and the license and the registration were

2   scannable and scanned, that does not establish that the source

3   of the information was any of those documents.  It does not

4   establish liability.  Why?  Because the officers ask the driver

5   if the information is -- is correct.  If they follow their

6   training, that's what they'll do.  And if the information is

7   not, then they'll get the information from other sources.  And

8   the officers can then -- and what do they do?  They change the

9   information that's been scanned in if they do it.

10       Every witness agrees with this.  Every witness agrees, and

11  it is precisely what happened with the plaintiff herself.  The

12  fact of the matter is that the address on her driver's license

13  is not the address on the report.  It was manually typed in.

14  And so even if the officers do follow their training, this is

15  not common proof of liability.

16       It's not our position that plaintiff has the burden at this

17  stage to prove that the information on every report came from a

18  DOL record, but it is her burden at this stage to show that

19  there's a way that she can prove this at trial with common

20  proof; and, Your Honor, she's not done that, and we submit she

21  can't do that.

22       I'd like to talk about some of the facts before the Court,

23  and I thought -- I've got a four-page document that simply --

24  that doesn't summarize; it just pulls out some of the

25  information that's in the court record.  One of the documents

1  was filed under seal so I didn't want to put it up on the Elmo,

2  but I thought I'd pass it out.

3           THE COURT:  All right.  Can you give me a cross-

4  reference to the ECF number?

5           MS. DUFFY:  It's on the document.

6           THE COURT:  Oh, I see.  Thank you.  So that's ECF

7  No. 90.  All right.

8           MS. DUFFY:  Now, first before I talk about the

9  handout, there's obviously some information on these PTCRs that

10 comes from the driver themselves or from other unprotected

11 sources.  The phone number, the insurance information, how the

12 accident happened, there's obviously an interview.

13     Now, when asked if there was any way someone could

14 determine the source of these PTCRs by simply looking at it,

15 every single witness gave the same answer.  No, it's impossible.

16 When asked if there was a way to determine if the PTCR was

17 created -- was created by a scan on SECTOR, the answer was

18 generally the same:  No.

19     Now, there's no way for plaintiff to prove that the

20 officers actually followed their training; that's not

21 documented.  And there's no way for plaintiff to prove that the

22 officers actually scanned the information -- excuse me, and the

23 only way for plaintiff to prove that if the officer actually did

24 scan the documents into SECTOR and the information on the report

25 is reflected by the documents that were scanned is to simply ask

1    the officer who completed the report.

2         And those asked who testified before the Court said that

3    even if they did scan the documents into SECTOR, if it was

4    wrong, they would change the information.  They would just

5    delete it.  And to do that, they would look to many sources,

6    using any number of resources, including the proof of insurance,

7    the drivers themselves, a passenger, maybe a witness statement.

8         And there is no common proof that will tell us whether what

9    they scanned was changed, and if it was changed, what was the

10   source of the information, because there's simply no way to

11   reconstruct from data whether the driver's license,

12   registration, or driver's return was used to create the record.

13   And there's no way to know if the source of the record -- report

14   was a driver's license, a registration, a driver's return, the

15   driver themselves, a passenger, the insurance card, or a witness

16   statement.  We would have to go driver by driver, report by

17   report.

18        The testimony before the Court makes this clear.  We've got

19   deposition testimony from the 30(b)(6) designees.  They all say

20   this; Morhous, McGee, Moon.  There's just no way to know the

21   source of the PTCR.  And as for access, the driver's return,

22   they're not commonly used, but when they are used, generally to

23   verify the information that the officer already has.  And while

24   there may be a way to identify whether an access was -- whether

25   a driver's return was made, there's just no way to bring it back

1  to the report.

2       Now turning to the handout, in addition to the testimony by

3  the 30(b)(6) designees, other officers who are doing this every

4  day day-to-day here in the Spokane area shared their testimony,

5  and just look at it closely.  The first page is the declarations

6  of Zachary Dahle, who reviewed the first PTCR; he's here in

7  Spokane; Sergeant Lasher, who reviewed the second PTCR, also in

8  Spokane, he's a State Patrol; and the third is David Thornburg,

9  who's been around with the Spokane Sheriff's Department, the

10 police department.  All of them say that there's no way to know

11 from the PTCR if -- what they did and what information they used

12 and that they often use and they do use -- when they're creating

13 accurate information in the PTCR or correcting something that

14 they type it in and they use other sources.

15      The plaintiff's own records make our point, and to

16 demonstrate it most clearly, we ask that the Court consider that

17 first PTCR.  That's ECF 62-4.  It's Exhibit 16 to the Kirchofer

18 dep.  And in particular, take a look at the second page of the

19 handout.  This is simply a summary of some of the statements in

20 Officer Ferguson's declaration, which is ECF 88 before the

21 Court.

22      Here's what Officer Ferguson says about the PTCR that he

23 created.  He says when he investigates a collision, he brings

24 with him a notepad.  Every officer who testified said that; that

25 when they go to the driver, they have a notepad with them.  He

1  jots down information given to him by the driver.  That's

2  Paragraph 3.

3       Now, in this case, there is no dispute before the Court

4  that the address on plaintiff's driver's license was different

5  than the address on the PTCR that plaintiffs have submitted to

6  this Court.  And -- and in that event, look at what Officer

7  Ferguson says he would do if the driver's license is different.

8  This is what he would do.  At Paragraph 6, he says, "I would

9  have obtained the address shown on the report from Ms. Wilcox

10  herself and typed that information directly into the collision

11  report based on my typical practice."

12       Now, if her address was not reflected on her driver's

13  license, he would have written down the right address on his

14  notepad, and he would have typed it in.  So as for the 2015 PTCR

15  for plaintiff, there's individualized evidence that her personal

16  information did not come from her driver's license or her

17  registration, but it came from her own lips.  And if Officer

18  Ferguson is to be believed in this situation, there was no DPPA

19  liability, and plaintiff herself falls out of the class for this

20  first PTCR.

21       Now, while Officer Ferguson does not remember if he

22  followed his training, if he scanned in her driver's license or

23  registration, but what he -- but that is -- that is what he

24  would have done.  That was what he was trained to do.  But even

25  if the training he -- was followed, there's no way to know if

1 the source of the address on this document was her driver's

2 license, her registration, or, least likely, a driver's return.

3 And as Officer Ferguson says, it probably came from her own

4 lips.

5      Now, as for the new address box, you'll notice in that PTCR

6 it is not checked.  He didn't check the address box.  Yet the

7 address on the driver's license is different than the one -- we

8 know that it was not her correct driver's license, and we know

9 that it was changed on the -- on the PTCR.  Officer Thornburg

10 tells us that the absence of new address boxes is common.

11      But there's so -- but the point simply is that there's no

12 easy way to use this new address -- address box, excuse me, to

13 cure the problems with plaintiff's case.  We simply couldn't

14 exclude those with the new address box checked because if we did

15 that, we would not have excluded this one; and we know for a

16 fact that the driver's license address is not reflected on the

17 report.

18      Now I want to talk about the second collision report, the

19 second PTCR.  That's ECF 65-2, Exhibit 17 to the Kirchofer dep.

20 Now, here there are two drivers on that report.  There were two

21 on the first one.  And by the way, you'd need to do this

22 analysis for every driver on every report.  So we know that the

23 address on the -- you can see from that document that the new

24 address box was checked; so that tells us that the record, the

25 report, does not reflect the address on the driver's license;

1  and it raises the question, of course, so that, well, what was

2  the source of that information on the PTCR?

3       Well, we know through discovery that plaintiff gave a

4  witness statement in connection to this collision, and I'd like

5  to turn the Court to the third page of the handout.  This is the

6  document that was filed under seal, and -- and the version in

7  front of you, of course, is unredacted.  It was filed in

8  redacted form.  Now, you can see from this document that all of

9  the information at issue in this case is there.  In Jade

10 Wilcox -- in plaintiff's own hand, it's information that she

11 gave to the officers.

12      Now, like Officer Ferguson, Officer Stevens does not

13 remember how he completed the PTCR or whether he scanned the

14 driver's license and registration into SECTOR.  But if you turn

15 to the last page of the handout, just excerpts of Officer

16 Stevens' declaration, look what he said; that while he doesn't

17 remember the event, he was able to reconstruct it by looking at

18 his dash cam.  He also said he looked at his e-mail.  And what

19 he -- what he remembered after reviewing these documents is he

20 obtained some information from -- from Sergeant Lasher, the

21 driver's license and the registration.

22      He also says that if the information on the driver's

23 license was not correct, he would delete the prepopulated field

24 if it was scanned in, and he would type in the information.  And

25 he tells the Court that there are multiple ways to gather

1   driver's information to complete the PTCR; and if there's no

2   driver's license or the driver's license on the -- excuse me, or

3   the information on the driver's license is not current, as is

4   here, that he will get this information from some other source.

5          And at Paragraph 6, he tells the Court those other sources:

6   verbally from the driver or maybe a passenger.  He might get the

7   information from another officer.  He might get the information

8   from a witness statement or proof of insurance.  Admittedly, he

9   might get the information from the registration or a driver's

10  return.  But he tells the Court that he does not recall the

11  source of the information that he used when he input that.  It

12  could've been any of them.

13         Now, the point here, Your Honor, is that plaintiff has not

14  established that the source of the information of either PTCR

15  before the Court was a motor vehicle record.  On this record, a

16  trier of fact could find that the source of the information for

17  both these PTCRs was not a motor vehicle record.  That is even

18  if -- even if the Court finds that the driver's license or the

19  scan bar or the registration of the scan bar was a motor vehicle

20  record, and the outcome could be different for the two different

21  records.

22         But it's not surprising to us that plaintiff has not yet --

23  has not moved for summary judgment on this issue of whether the

24  source of the information on these records was a motor vehicle

25  record because, of course, on these facts, it would be futile.

1    Class-wide proof will not establish liability in this case, and

2    the SECTOR training for the -- the PTCR does not save

3    plaintiff's claim to the contrary.

4                THE COURT:  Ms. Duffy, may I ask a question?

5                MS. DUFFY:  Sure.

6                THE COURT:  It strikes me that you are somewhat

7    conflating two issues.  One is being able to identify the

8    members of the class, which the handout and your argument about

9    what the source was of the information going into the report

10   would lead to individualized concerns, versus the issue of

11   commonality of the legal issues and the proof to prove

12   defendants liable; that is, once the Court decides whether or

13   not such information is protected, then whether or not

14   defendants are liable for using that information for members who

15   have been properly identified as being in the class.

16       So in other words, you're talking about the addresses, the

17   source of the information to argue that there's no commonality

18   of evidence on the liability issues, but it strikes me that the

19   argument about the source of the information is going to be an

20   issue that has to be resolved in identifying the members of the

21   class.

22                MS. DUFFY:  Well, it's because of the way the

23   plaintiffs define the class that it does -- it does relate to

24   both.  And while -- while the class -- while plaintiffs have

25   presented ostensibly an ostensive measure to identify the class,

1   those whose personal information was derived from a motor

2   vehicle record, the problem is that it requires a deeper dive

3   and individualized inquiry to -- to figure that out.  It is the

4   same issue.  It is the same issue on liability, and I think what

5   plaintiff does is they sort of gloss over it.

6         And I want to talk about the *ConAgra* case because I think

7   that's where they do that is they -- they confuse the issue of

8   determining who gets to share in the -- in the class once

9   liability is established, once the damages are established, and

10  -- and how do you identify the people who can share in the -- in

11  the proceeds versus how do you even establish the pot?  And in

12  this case, you don't even get to what the damages are until you

13  determine that the information on the -- on the -- on the

14  collision report was actually derived from a motor vehicle

15  record.

16        So, I mean, two things there.  I mean, I think the

17  plaintiff would have the Court believe that, "Look, once you

18  decide this legal issue about, you know, the driver's license

19  and the registration, then we're home-free.  I mean, that's the

20  common issue."  But they're not, and that is our point is that

21  you could decide that.  You could decide, like the *Pavone* case

22  did, like the *Meyerkord* court did, that a driver's license is a

23  motor vehicle record.  You could decide that.

24        But -- but the common training that has these officers

25  asking for the driver's license, asking for the -- the

1 registration, that doesn't prove liability because we know by

2 every officer who's testified that what -- even if it is scanned

3 -- and it often isn't. But even if it is scanned, what was

4 scanned is not what was reflected in the -- the collision

5 report.

6     And -- and to plaintiff's counsel's, you know, kind of hack

7 or a solution to this problem about, "Well, we could just go to

8 the DOL and we could just see who whose address has changed,"

9 that won't work; two reasons. One is you still have to go

10 driver by driver, report by report; and secondly, look at --

11 look where that would lead us with plaintiff. I mean, Officer

12 Ferguson -- I mean, if you -- and we know it's circumstantial,

13 we know it's inferential, but we have to acknowledge that

14 there's a factual dispute there about the source of that

15 address. And what he says is, "I got it right from her lips. I

16 wrote it down."

17     And the DOL's license would probably have for registration

18 the same -- the same -- the same address as on that PTCR, but he

19 says he got it from her unprotected source. So even if Your

20 Honor decides that the registration is protected, that PTCR,

21 there's no liability, and that's our point. The practice only

22 gets them so far. The training only gets them so far. It does

23 not establish liability, and they have to come to the Court with

24 common proof of liability, which is what happened in the *ConAgra*

25 case, which I'll -- which I'll talk about now if you'd let me.

1          THE COURT:  Certainly.

2          MS. DUFFY:  In the *ConAgra* case, plaintiff's right.

3   It was a consumer class action alleging that ConAgra misled

4   customers by falsely labeling Wesson oil as 100 percent natural

5   when in fact it was made with GMOs.

6          In *Briseno*, the case was addressing whether plaintiff had

7   to identify every class member who could share in the recovery

8   once the damages were determined after liability was determined.

9   In fact, the court discusses how other courts have allowed for

10  claims administrators, auditing processes, sampling, fraud

11  detection to validate claims, to validate claims.  It even cites

12  the *Comcast* case, the U.S. Supreme Court case, that the "need

13  for individualized damages determinations after liability has

14  been adjudicated does not preclude class certification."

15         And at Page 1132 of the *Briseno* case, the court makes very

16  clear that plaintiff had proposed to prove ConAgra's aggregate

17  liability using common proof.  What they planned to do is show

18  that the difference in price between 100 percent natural and

19  made with GMO was X, and they could -- they would get that with

20  their experts; and through discovery from ConAgra, they would --

21  they would determine how many people bought the 100 percent

22  natural oil; and from that, they'd simply multiply the

23  difference by the purchases, and they would have a pot.

24         And then the issue was, Okay, who's going to share in the

25  pot?  And ConAgra argued, "No, no, no.  You can't ascertain

1    these people because, you know, they don't have receipts.  How

2    are you going to prove it?"  And -- and that's when they argued

3    for this -- this additional hurdle to class definition about the

4    administrative feasibility.  That is not what we're arguing.  We

5    know that.  The Ninth Circuit does not accept that.

6          But -- but what the Ninth Circuit does require is common

7    proof on liability.  And in the case of *ConAgra,* even if once

8    the -- once the pot was determined, even if they couldn't figure

9    out everybody who bought a Wesson oil, well, that's what the

10   high price is for.  So they'll just take the pot, which is

11   determined by liability, and then the rest will go to cy pres.

12         But here, you don't get to the pot.  You don't get to

13   $2,500 per until you establish that -- that each one of those

14   reports was derived from a motor vehicle record, and -- and the

15   evidence here is that even if the police officers follow their

16   training, there's more to it than that, and it requires

17   individualized proof.  This is the fallacy of plaintiff's

18   argument.

19         Here, the individual issues predominate over the issue --

20   predominate on issues of liability; so there is no cure to the

21   problem.  And in addition to the -- the issue of identifying

22   class members objectively, well, plaintiff suggests that we can

23   simply sort this out in some sort of administrative process,

24   that we can just sort it out after liability; we can let people

25   make claims.  But she fails to -- to articulate how, when, by

1    whom.  I mean, certainly we would want to know if that person

2    submitted a witness statement like the exhibit that's in front

3    of you, like Jade Wilcox's own witness statement.  We'd want to

4    know that for each -- each person.  That's liability.

5         And how then would the defendants' due process rights be

6    protected under a system where the Court just says, "Yeah,

7    there's a common issue here.  Everybody's 2,500 bucks, and now

8    we'll sort out -- we'll sort out who gets paid what."  I mean,

9    it simply doesn't work in this scenario, and this case does not

10   apply.

11        *Briseno* does not apply or *ConAgra* does not apply simply

12   because of the issue of liability.  I mean, that's what we're

13   debating.  That's what we're concerned about is not so much -- I

14   mean, it's a similar issue because of how the plaintiffs define

15   their class.  They frankly did us a favor with how they define

16   the class, but it's -- it's the same issue.

17        Finally, I'd like to address the *Meyerkord* decision, which

18   belittled by plaintiff, it's very much on point, and -- and this

19   is a -- well, *Meyerkord* was -- is the only case in the country

20   that addresses Rule 23 in the context of the DPPA concerning

21   collision reports.  It's the only case that addresses collision

22   reports in the context of the DPPA.

23        Now, in *Meyerkord*, plaintiff was attempting to certify two

24   classes, two.  One was a statewide class related to names of

25   drivers on collision reports obtained by a law firm for

1  marketing purposes.  Importantly, Your Honor, non-drivers were

2  excluded from that class.  That's a distinguishing point for

3  plaintiff here, but it's not -- it's false.  I mean, in the

4  statewide class, non-drivers were excluded.  The second class

5  was a national class of anybody whose name was on the report,

6  and that was against the outfit that created the software that

7  the reports were generated by, and then they apparently were

8  selling these reports.

9       The court denied class cert. for both, finding that

10 plaintiff failed to satisfy the requirements of Rule 23,

11 specifically commonality, predominance, and typicality, because

12 the individual facts concerning whether the source of the

13 information on the collision reports was -- was obtained from a

14 motor vehicle record, precisely what we're saying to the Court

15 here.

16      Now, some background on *Meyerkord* or *Pavone*.  Plaintiff

17 claimed that the driver's license was the source of the personal

18 information on the collision report.  The district court in the

19 -- in *Pavone* had already found that it was, that the driver's

20 license was a motor vehicle record, the same position plaintiff

21 takes here.  Now, in *Pavone,* plaintiff claimed it was a best

22 practice in the policing profession regarding how the reports

23 should be created using these driver's license as the source of

24 the collision report.

25      Plaintiff argued that there was a -- that a common practice

1  was sufficient to meet its burden to show to the court that it

2  could prove that personal information on the collision reports

3  was derived from the driver's license, and the plaintiff argued

4  having made that showing of common proof that it was now

5  defendant's responsibility to demonstrate that this best

6  practice was not followed and the defendant must prove that the

7  report was not created using the driver's license.  Much like in

8  *Meyerkord* plaintiff's points here, plaintiff points to common

9  proof of police training in Washington to avoid this

10  individualized inquiry.

11       But despite the evidence offered of best practice, the

12  *Meyerkord* decision recognized what we ask the Court to do here;

13  that even if the protocol or the best practice or the training

14  was followed, the common proof, this does not prove liability,

15  and it -- it does not prove that the source of the information

16  on the report was the driver's license or some -- or whether it

17  was some other source.  Like here, in *Meyerkord*, there was

18  evidence before the Court that showed that no two crashes are

19  going to be exactly the same, and there were too many variables,

20  individual situations.  We have that testimony before the Court

21  in our briefing.

22       Like here, in *Meyerkord*, there was evidence before the

23  court that sometimes officers create reports on computers,

24  sometimes by hand; sometimes officers use information from

25  handwritten statements or databases or from the parties

1   themselves, the drivers themselves.  The testimony in our case

2   from every police officer or trooper who testified is the same.

3         You just can't tell by looking at it what the source of the

4   information was; and there's no way to determine if the report,

5   the PTCR, was created using a scan, which -- and it's not

6   unusual for drivers not to have their license, registrations, or

7   for them to be unscannable.  And if there's -- if there's no

8   scan, the source of the information could be a number of things:

9   the drivers themselves, proof of information, other things.

10        But even if there was a scan of the driver's license and

11  the registration or the driver had those documents and the

12  information is -- is not correct, the officer simply deletes it

13  and he adds information from other sources; and those sources

14  could be those protected by the DPPA, but the evidence before

15  the Court is the sources could be those not protected by the

16  DPPA, such as insurance cards, drivers themselves, witness

17  statements.

18        And finally, like here, the *Meyerkord* found that the

19  centralized software program used to create and distribute these

20  reports did not track how the source of the content gets onto

21  the crash report.  That's what we have here.  It's -- there's no

22  -- nothing -- no way to track that.  The Court then found that

23  the plaintiff could not satisfy Rule 23(b) because

24  "individualized questions pertaining to how each officer gathers

25  information to create crash reports would predominate over the

1  common questions in the case."

2      We ask the Court to follow and to do the same thing as the

3  *Pavone*, the *Meyerkord* did -- case did and find that plaintiff

4  here has failed to establish that she can prove that the source

5  of the personal information on the reports is a motor vehicle

6  record and that she can do so under common proof, not on this

7  record before the Court.  On the record -- on the record before

8  this Court, plaintiff cannot even establish that the information

9  on her own records was derived from Department of Licensing

10  records.

11      The Swapp Law practice of purchasing these reports is done.

12  It's been done since 2016.  They don't do it anymore.  But the

13  -- as we put in our briefing, the State Patrol has sold over

14  270,000 reports to these uninvolved parties, people like the

15  Swapp Law Firm.  Other law firms have purchased 40,000 of these.

16  Some other -- one single law firm in -- in the record we've

17  established has -- has purchased over 40,000 of these -- of

18  these same records.  This was done.  These were records that

19  were sold by the State Patrol.  They were pre-redacted.

20      Before the Court subjects this law firm to over $40 million

21  in liability through this class action, it should at least put

22  plaintiff to the burden of showing it can establish liability

23  through common proof, and it should at least do so in a way that

24  protects the defendants' due process rights to make its case.

25  And -- and we submit on the record before this -- before this

1  Court there's no way to do this using common proof.  It requires

2  an individualized report-by-report, driver-by-driver analysis.

3  It's clear in the record.  Thank you, Your Honor.

4         THE COURT:  Thank you.

5      Mr. Barton, would you care to have rebuttal?

6         MR. BARTON:  Yes, Your Honor.

7         THE COURT:  All right.

8         MR. BARTON:  Your Honor, the defendants start with

9  two cases which I think are illustrative of where they go.  They

10 start with the *Zinser* case, which is a products liability case.

11 The Ninth Circuit affirmed the denial -- denied certification

12 there because of problems with establishing individual issues of

13 causation and then the fact of damage, which is common.

14 Products liability cases don't get certified.  I don't think

15 that is a good place to start.

16     The second case that they cite or rely on from the -- from

17 an appellate court is the *Wal-Mart* case, and the problem with

18 *Wal-Mart* is that the Supreme Court found there was a -- and

19 admittedly, it was a lack of policy and a lack of uniform

20 practice.  That's what the plaintiffs were challenging in that

21 case is the lack of any policy or practice; and that, the

22 Supreme Court said, does not create certification.  Now, it also

23 was an attempted certification under (b)(2) and not (b)(3),

24 which has more rigorous standards than (b)(3).

25     The defendants make the statement that there's no way to

1  tell if something is scanned or a handwritten report.  That's

2  actually not accurate.  Officer Gibbs testified -- and that's

3  submitted as Exhibit 4 about the numbers and identifying letters

4  on collision reports, and this is 8, 13, 15 and 16.  And he goes

5  through and explains that there are codes as to whether or not

6  they were handwritten reports or -- the reports were created in

7  a handwritten form or by the SECTOR; so there is a way to

8  distinguish between those reports.

9       The second thing that the defendants entirely ignore is the

10 testimony by Carla Weaver, and this is Exhibit 19 on pages --

11 Page 123.  And I asked her the question of whether or not the

12 Department of Licensing keeps records of how long -- of whether

13 a driver has updated his address, and they do, and they have it

14 going back seven years.  And what defendants completely ignore

15 is it -- what is the problem of taking a driver's license -- I'm

16 sorry, an accident report, looking at the license, and comparing

17 whether or not it matches up what the Department of Licensing

18 had either as the registration address or the driver's license

19 address?

20      If you do that -- and we know that there are standard

21 procedures of how these forms are created.  That will give you a

22 pretty good -- I think a highly reliable way to ascertain

23 whether or not the information on the collision reports came

24 from DOL data, either driver's license, bar code data, or the

25 driver's license.  We will know that.  And what defendants focus

1   on -- and I think you have to listen closely to what they say --

2   is if the driver's license bar code data or the driver's license

3   information is not available, if it's incorrect, the driver --

4   the officer will delete the information and change it.

5          So this, to me, provides a very good way of matching up, at

6   least for anybody -- if their address was -- had been updated

7   with the -- and matched with the Department of Licensing and

8   that matches the accident report, that, I think, provides -- and

9   given the standardized procedures of what they do and if the

10  driver's license -- they use the registration first, driver's

11  license second from the scan or from the front of license.  If

12  that matches what's in the Department of Licensing database and

13  the address history matches up, I think we have a very good

14  certainty that that's how the officer created this report,

15  particularly anything that was created by SECTOR.

16         The defendants repeatedly have a mantra of "You have to

17  look at every single person, and unless you do that, you can't

18  have liability here."  I think if you look at the *Tyson Food*

19  case, that contradicts their argument.  And what *Tyson Food* --

20  the *Tyson Food* case was about, it was what is called a donning-

21  and-doffing case.  And I don't know if you've had any of these

22  here, but they have been common under the Fair Labor Standard

23  Act.

24         And what -- the practices of a number of employers that

25  require significant -- their employees to engage in significant

1  -- what was unpaid time essentially to get ready for work, to

2  put on special -- "clothes" is probably not even the right term

3  for it, but special things that they need to wear that take

4  significant time to put on and take off because of the nature of

5  their jobs, and the question was whether or not that time was

6  compensable.

7       And Tyson Food didn't have records, and there was a

8  question of whether or not all employees should be included and

9  who -- who would be included.  And what the plaintiff ultimately

10 relied on is an estimate in terms of -- of a proxy for some

11 number of people that would've been included, would've exceeded

12 the time or minimal time, and so that came up with an aggregate

13 award.  And as part of that -- now, on appeal to the Supreme

14 Court, Tyson Food argued that there were people who were not

15 injured as part of the class and that that undermined class

16 certification, and the Supreme Court rejected that.

17      There is also a second way that damages could be awarded in

18 this case.  It does not require that you have an aggregate

19 liability amount to the class.  You could make an individual --

20 you know, a per-class-member award and then come up with a

21 determination, but there's also a way -- the defendants assume

22 that we could not do the analysis of the reports and the DOL

23 address like history data pretrial.  There's no reason we

24 couldn't do that before.  If the Court required us to do that,

25 we could do that, and that would be -- serve as a very good

1   proxy of who should be included in the class.

2        Now I want to talk about defendants' argument about

3   Ms. Wilcox specifically and what they contend makes her atypical

4   and that she somehow illustrates that she -- or she's not a

5   proper representative because of her personal collision reports.

6   What they rely nearly exclusively on are -- well, probably a

7   combination of the declarations by the officers and then some

8   assumptions that they make, and they ignore Ms. Wilcox's

9   testimony, but if you look at each of the declarations -- and we

10  can start with Officer Ferguson.

11       The defendants present what Mr. -- Officer Ferguson and

12  Officer Stevens as having some memory of what they did

13  specifically with respect to Ms. Wilcox and how they created the

14  report.  That's not the case.  What they do and they both said

15  -- and with respect to Officer Ferguson, what he says in

16  Paragraph 3 of his declaration, he says, "Ms. Wilcox's collision

17  report is one of just a few that I have prepared over the past

18  several years."  Then he says, "While I don't have a specific

19  recollection of how I prepared the collision report..."  That's

20  what he says.  He doesn't have a recollection.

21       He then goes on, and the rest of his declaration is

22  essentially speculation about what he did and what he may have

23  done.  "I typically do this," "I may have done that."  If you

24  look at Paragraph 6, I think it is illustrative.  He says, "I

25  have been informed," doesn't say from whom, "that the address on

1  her then current driver's license does not match the address

2  shown on the collision report."

3       What -- and what this glosses over, what the defendants

4  gloss over is the address on her registration on -- in both

5  instances did match the collision report; and given the standard

6  procedures and the preferences, it is go to the registration

7  first, then the driver's license.  That's what the officers are

8  instructed to do.

9       So after he says that, he says after the address -- he was

10 told that the driver's license doesn't match the address shown

11 on the collision report.  He does not mention anything about the

12 registration, but he then says, "Assuming that is the case, I

13 would have obtained the address shown on the report from

14 Ms. Wilcox herself."  There's nothing in there -- he's

15 apparently not asked or told anything about the address on the

16 registration statement.

17      Likewise, Officer Stevens at Paragraph 4 of his declaration

18 says, "I do not specifically recall how I prepared the collision

19 report for this incident," meaning Ms. Wilcox, "or what

20 information I used."  That's what he says.  He doesn't recall.

21 Ms. Wilcox did testify she did recall.  So these are not

22 competent ways to rebut Ms. Wilcox's testimony.

23      What they then do is speculate how they might have done it

24 based on a variety of things, but that does not rebut

25 Ms. Wilcox's testimony in terms of what she in fact gave, that

1  she confirmed that her registration was -- address was accurate;

2  and there's no dispute that that -- the registration -- her

3  address on her registration matches what's on the collision

4  report, and there's no dispute that the address on her

5  registration was up-to-date.  No one disputes that.

6         Given the practices, I think the logical conclusion that

7  any fact-finder could draw is that's where the information came

8  from, and she states that she did not provide other information.

9  And given the -- the standard procedures, an officer -- the

10 standard procedures and training would say the officer should

11 take it off of a registration state -- off the registration bar

12 code data or the front, take it off the driver's license bar

13 code data or the front before he looked at an insurance card,

14 before he looked at a witness statement, before he looked at

15 anything else.

16        The defendants made a statement that plaintiffs have not

17 moved for summary judgment with respect to the issue of a

18 driver's license and a registration being -- or the bar code

19 data being motor vehicle records.  There's a reason for that,

20 and that is plaintiffs do not move for summary judgment prior to

21 the time the class is certified because there is a principle

22 called one-way intervention; and defendants often object that if

23 we move for summary judgment, it allows absentee class members

24 the opportunity, which is unfair to the defendants, to come in

25 only after a significant portion of the case has been decided.

1   That's why we have not moved.

2        With respect to the *Pavone* case, defendants emphasize the

3   existence of a best practice, but what they ignored is what is a

4   best practice versus actual training, actual procedures at a

5   specific law enforcement training -- training program or law

6   enforcement manual.  This is what -- if you look at Note 5 in

7   the *Pavone* case, Footnote 5, what the plaintiff relied on is his

8   best practices.  It says, "The plaintiff sets forth the National

9   Highway Traffic Safety Administration's model minimum uniform

10  crash criteria and the state of Illinois traffic record

11  assessment."

12       That's where the best practices comes from.  It is not a

13  systematic training program.  It is not an official manual that

14  the Washington State Patrol has put down or that all their law

15  enforcement officers use across this state.  It's significantly

16  different.

17       I think the defendants repeatedly say there are many

18  sources as to the source of the data.  There really are not.  I

19  mean, there are two that matter; the bar code data, the

20  registration, and the license.  What the defendants want and

21  what they keep saying is there needs to be a way to identify,

22  and I think Your Honor's question goes to the heart of this is

23  -- and if you look back at the *ConAgra* case, perfection is not

24  required.  What we have to have is a reasonable way for a juror,

25  for a fact-finder to come in and make a determination of -- that

1    there is a reasonable approximation that this happened.

2    Perfection is not what's required by the Ninth Circuit.  It's

3    not required but was required by the Sixth Circuit.

4        One further thing, just one small point, Your Honor.  The

5    defendants on the prior motion and this motion have thrown

6    around $40 million of liability.  That's something they've come

7    up with.  It is not a number the plaintiff -- anywhere from the

8    plaintiffs.  It's not a relevant consideration for -- for class

9    certification.  Unless Your Honor has any other further

10   questions, we request you certify this class.

11       I would like -- I'm sorry.  I would make one further point.

12   I think this is not something the defendants have actually

13   raised in their papers, but they have sort of suggested there's

14   some problem with the class definition.  This Court, if they

15   think there's some tweaking that needs to happen for the class

16   certification, the -- I believe the Ninth Circuit has said the

17   Court has the authority to essentially modify the class -- class

18   definition as it deems appropriate if there's something specific

19   within the class definition.  So if -- rather than denying class

20   certification, if there's something that needs to be modified,

21   that's what the Court should do; modify the class definition and

22   certify the class.  Thank you, Your Honor.

23           THE COURT:  All right.  Thank you, Counsel.  I will

24   issue a written order.  Court's adjourned.

25       (Court adjourned on December 13, 2018, at 11:05 a.m.)

1              C E R T I F I C A T E

2

3       I, ALLISON R. STOVALL, do hereby certify:

4       That I am an Official Court Reporter for the United States

5    District Court for the Eastern District of Washington in

6    Spokane, Washington;

7       That the foregoing proceedings were taken on the date and

8    place as shown on the first page hereto; and

9       That the foregoing proceedings are a full, true, and

10    accurate transcription of the requested proceedings, duly

11    transcribed by me or under my direction.

12       I do further certify that I am not a relative of, employee

13    of, or counsel for any of said parties, or otherwise interested

14    in the event of said proceedings;

15       DATED this 1st day of February, 2019.

16

17    _____
      ALLISON R. STOVALL, CRR, RPR, CCR
18    Washington CCR No. 2006
      Official Court Reporter
19    Spokane, Washington

20

21

22

23

24

25